# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>3830 Pinewood Terrance, Falls Church, Virginia, 22041<br>which is a single family residence with yellow siding and<br>white trim | )<br>)<br>)<br>)<br>)<br>) |

Case No.1:17-sw-823

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 924(c) | Use and Carry of a firearm during and in relation to a drug trafficking crime. |
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute and PWID controlled substances. |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Carina A. Cuellar

_____
*Applicant's signature*

Jonathan F. Earle, ATFSpecial Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 12/04/2017 _____

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, VA

Hon. Theresa Carroll Buchanan, US Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is 3830 Pinewood Terrance, Falls Church, VA 22041 (the "PREMISES"). The PREMISES is described as a one story detached structure designed as a single family home. The structure is covered in yellow siding and a gray shingled roof. The address number "3830" is displayed in black numbers attached to the siding to the left of the front door. The front door is black with a white framed storm door. There is a small concrete landing with concrete stairs leading to the front door. A concrete walkway extends from there to the street in front of the structure. In addition, the search shall be extended to any locked safe or container within the PREMISES.



## **ATTACHMENT B**

*Property to be seized*

a)       The items to be seized are fruits, evidence, records and information relating to,

contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1)

and 846(a) (distribution and possession with intent to marijuana and other controlled substances,

and conspiracy to distribute marijuana and other controlled substances) and Title 18, United

States Code, Section 924(c) (carry and use of a firearm during and relation to a drug trafficking

crime), including, but not limited to:

a)  Illegal narcotics and drugs, in particular heroin and cocaine, Schedule I controlled substances.

b)  Firearms, magazines, and ammunition;

c)  Receipts documenting the purchase of firearms, magazines, and ammunition;

d)  United States currency derived from the sale of controlled substances;

e)  Money ledgers, and other documents noting the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or money was possessed or transferred;

f)  Bank statements and records, which might reflect the proceeds generated from the sale of controlled substances;

g)  Indicia of control, or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, canceled envelopes and keys, photographs, and bank records;

h)  Cellular phones, computers, and other electronic storage media or digital devices;

27

    i) For any electronics searched, any conversations, whether through text messages or other applications, where JOHNSON discusses the purchase and sale of heroin and other controlled substances;

    j) For any electronics searched, any conversations, whether through text messages or other applications, where JOHNSON discusses the purchase and use of firearms; and

    k) For any electronics searched, any photographs of controlled substances, firearms, ammunition, firearms receipts, and documentation related to the purchase of firearms.

b) For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a) evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b) evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c) evidence of the lack of such malicious software;

28

d)  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e)  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f)  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g)  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h)  evidence of the times the COMPUTER was used;

i)  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j)  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k)  records of or information about Internet Protocol addresses used by the COMPUTER;

l)  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m)  contextual information necessary to understand the evidence described in this attachment.

29

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF:

**3830 Pinewood Terrance, Falls Church, Virginia, 22041 which is a single family residence with yellow siding and white trim.**

Case No. 1:17-sw-823



### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jonathan F. Earle, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3830 Pinewood Terrance, Falls Church, VA 22041, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B. As further explained herein, JAVELL MARQUES JOHNSON has conspired to distribute controlled substances and used and carried a firearm during and in relation to a drug trafficking crime, within the Eastern District of Virginia and elsewhere. Further, JOHNSON uses the PREMISES to both store and distribute controlled substances.

2.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for approximately eight years. I am currently assigned to the ATF Falls Church Group II Field Office. During my career, I have investigated individuals for the illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics trafficking.

3. Based on my training and experience, I know that individuals involved in the distribution of controlled substances keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm-related items in their residences. In addition, in an enterprise involved in the distribution and possession with intent to distribute controlled substances, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade. For example, small and large plastic baggies are the packaging material of choice for many narcotics; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold.

4. Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating party's cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

5. Based on my training and experience, I also know that information gained through the obtaining of data stored in the part of the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual. Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop

2

computers and/or smart phones.

6.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

A.    Background on the Investigation

8.      In June 2017, a cooperating source ("CI-1") reported to the Prince William County Police Department (PWCPD) that JOHNSON was a narcotics distributor.  CI-1 will be referred to in the masculine gender, regardless of CI-1's true gender.  CI-1 has previous convictions for Possession of a controlled substance, Forgery, and probation violations. CI-1 has previous convictions of Possession of a controlled substance, Forgery, and probation violations. CI-1 used to be a federal CI. However, CI-1 became untruthful, and federal law enforcement stopped using him.

9.      On June 8, 2017, CI-1 reported he could introduce a PWCPD Undercover Detective (UC) to JOHNSON. CI-1 stated JOHNSON was looking to sell a .40 caliber pistol that he was obtaining from a Pakistani male. CI-1 reported JOHNSON was selling heroin as well. CI-1 introduced the UC to JOHNSON over the phone. JOHNSON had previously been convicted of a felony and is prohibited from possessing firearms.

3

B. Controlled Purchase of Heroin from JOHNSON on June 9, 2017

10.     On June 8, 2017, the UC received a text message from (xxx) xxx-7929. Law enforcement knew this phone number belonged to JOHNSON because JOHNSON had used the same phone number during controlled purchases of narcotics in 2015 and 2016. In addition, the individual using the phone introduced himself as "Jack," and "Jack" is the known alias of JOHNSON. The UC confirmed that CI-1 had informed JOHNSON what he was looking for, referencing heroin and a firearm. JOHNSON reported he was ready "tonight, 2morrow, whenever you ready". The UC and JOHNSON agreed to meet on June 9, 2017.

11.     On June 8, 2017, law enforcement conducted surveillance at the PREMISES, the suspected residence of JOHNSON. Law enforcement observed a Jeep bearing a Virginia license plate parked at the location. A query of Department of Motor Vehicle records revealed the vehicle is registered to JOHNSON and another individual at the PREMISES.

12.     On June 9, 2017, law enforcement again established surveillance on the PREMISES. At approximately 10:42 am, law enforcement observed JOHNSON exit the residence.

13.     The same day, at approximately 12:20 pm, the UC contacted JOHNSON via text message and asked if he was ready to meet. JOHNSON reported he was in Alexandria, Virginia, near Landmark mall. JOHNSON instructed the UC to meet him at the Shoppers Food Warehouse where Duke and Little River Turnpike meet. The UC asked JOHNSON if he was able to get the firearm. JOHNSON reported he was working on it, but it was hard because it was summertime.

4

14.     Prior to the controlled purchase, law enforcement searched the UC and his vehicle and found them to be free of illegal contraband. Law enforcement then provided the UC with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

15.     Continuing on this date, at approximately 12:46 pm, law enforcement observed JOHNSON exit the PREMISES and get into a black sedan later identified as being a Nissan Altima bearing a VA license plate. At approximately 12:57 pm, JOHNSON entered the Shoppers Food Warehouse parking lot and entered the UC's vehicle. JOHNSON ask the UC how he knew CI-1. The UC stated he used to get from him (CI-1) in the Springfield area, but CI-1 wasn't dealing anymore, so he needed a new source. JOHNSON asked the UC if he fucked with the girl (purchased cocaine). The UC asked JOHNSON if he dealt that as well, and JOHNSON replied, "I've got everything, for real." JOHNSON stated he had three (3) grams on him for $240. The UC stated he wanted 3.5 grams of heroin. JOHNSON said he didn't know that, but the cost would be $275. JOHNSON reached into his right side and brought out a small plastic bag with a powdery substance consistent with heroin. The UC provided JOHNSON with $240 of agent cashier funds.

16.     The UC asked JOHNSON about firearms. JOHNSON said "his shit just popped off and niggas ain't trying to sell anything." The UC asked JOHNSON about selling one of his personal firearms. JOHNSON said they were his babies. JOHNSON stated he had two firearms, a .45 and 9mm, and his girlfriend had a .380. The UC asked him to sell the .45 and JOHNSON replied, "That's my baby, my girl gave that to me as a gift." JOHNSON stated he might sell the 9mm, but told the UC to give him a little while.

5

17.     The UC asked JOHNSON if he had a firearm on him. JOHNSON stated "Yea, I always got my 9." The UC asked JOHNSON to let it go and JOHNSON stated, "There's no point, bro. I just got in a shootout three days ago." JOHNSON stated he had bullet holes in his car from the shooting, which took place in Maryland.

18.     JOHNSON had the UC drive by his vehicle and JOHNSON pointed out the bullet holes to the UC. JOHNSON stated he was with two of his friends in Oxon Hill, Maryland when the shooting happened, in Eastover near Third Street. JOHNSON stated that one of his men was shooting back at the people.

19.     JOHNSON stated the shooting is why he isn't really selling his firearms right now. JOHNSON stated his homeboy, a Pakistani, was trying to sell his firearm. The UC stated he wanted too much and JOHNSON agreed. JOHNSON stated the UC could get guns down south for better prices. JOHNSON stated the UC could go to DC to get guns, but it is "hot" (increased presence of law enforcement). JOHNSON asked the UC he had any friends that didn't have a record because they could just walk into a gun store and buy it clean and it would be under their name.

20.     The UC asked JOHNSON if he had people in New York. JOHNSON stated, "I'm Blood." JOHNSON reported he had just taken his Jeep to New York, but they left the same night they got there because they all had guns on them and the police jumped out on them asking what they were doing in New York and if they were selling firearms.

21.     JOHNSON stated he had china white, tan, black, and brown heroin. The UC asked how much for a zone (ounce) and JOHNSON stated $2500. JOHNSON stated for an ounce, the

6

UC would have to drive to his man's house. JOHNSON then stated they could do the deal for an ounceat National Harbor, which the UC agreed to do in the future.

22.     At approximately 1:05 pm, the deal was concluded and JOHNSON exited the UC's vehicle. Law enforcement observed JOHNSON walk into Shoppers Food Warehouse then walk out a short time later and enter the black Nissan Altima. Law enforcement followed JOHNSON from the parking lot back to the PREMISES.

23.     The UC then drove to a location to meet law enforcement.   The UC provided law enforcement with the three (3) grams of suspected heroin. The UC and the UC's vehicle were searched for contraband with negative results. The suspected heroin was transported to the ATF Falls Church field office and determined to weigh approximately 3 grams.  The suspected heroin was sent to the DEA mid-Atlantic laboratory for analysis. The tests confirmed that the substance weighed 3.1 grams and contained heroin.

C.  Controlled Purchase of Heroin from JOHNSON on June 15, 2017

24.     On June 14, 2017, the UC was supposed to meet JOHNSON to purchase an ounce of heroin. Prior to the controlled purchase, JOHNSON contacted the UC and stated his girlfriend's father passed away and JOHNSON would have to do the deal on June 15.

25.     On June 15, 2017, at approximately 12:49 pm, the UC contacted JOHNSON and asked JOHNSON where he would like to meet. JOHNSON told the UC to park near the Cadillac Ranch located on Fleet Street in Oxon Hill, Maryland.  JOHNSON stated he would be in the area on foot and would walk to meet the UC.  Prior to the controlled purchase, law enforcement searched the UC and his vehicle and found them to be free of illegal contraband.  Law

7

enforcement then provided the UC with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

26. Before the controlled purchase, law enforcement established surveillance at the PREMISES. JOHNSON's black Nissan with bullet holes pulled into the driveway. At approximately 12:36 pm, law enforcement observed JOHNSON exit the PREMISES and drive away in the Jeep bearing the Virginia license plate. At approximately 1:36 pm, law enforcement observed JOHNSON park the Jeep on the side of the Cadillac Ranch. Law enforcement observed JOHNSON exit his vehicle and leave on foot.

27. At approximately 1:46 pm, the UC contacted JOHNSON and gave him his location. Law enforcement observed JOHNSON get into the front passenger seat of the UC's vehicle. JOHNSON stated to the UC he just saw a bunch of police. JOHNSON had the UC drop him off back at his Jeep. JOHNSON told the UC to follow him to the Tanger Outlets. The UC followed JOHNSON to the Tanger Outlets in Oxon Hill, Maryland. At approximately 1:57 pm, JOHNSON was observed getting back into the UC's vehicle. When JOHNSON got into the UC's vehicle, JOHNSON was on his cell phone. JOHNSON told an unidentified person on the phone that he was going to pull around because some other people had just pulled up on him and the UC. JOHSON had the UC drive around the Tanger Outlets and park again. JOHNSON informed the UC that he was going to give the heroin to the UC the same way he gets it from his man.

28. The UC asked JOHNSON about firearms. JOHNSON stated he had just sold his man a .45.

8

29.     JOHNSON had the UC pull over. Concerned by the presence of police cruisers, JOHNSON told the UC not to park and said he would call the UC when he was ready to be picked up. JOHNSON asked the UC if he had his cash ready, the UC stated he did.

30.     JOHNSON exited the vehicle and was observed by law enforcement meeting with an African American male in a blue Toyota bearing a Virginia license plate. A Department of Motor Vehicle records query revealed the vehicle was registered to an individual with a Washington, DC address. The UC also observed JOHNSON meet with a heavy-set African American male in the blue Toyota. At approximately 2:04 pm, JOHNSON contacted the UC and told the UC to go back to where they pulled over. At approximately 2:06 pm, JOHNSON came up to the UC's driver's window and provided the UC with a cup. JOHNSON informed the UC the heroin was in the cup. The UC asked the JOHNSON if he had a firearm on him. JOHNSON stated he did. The UC asked to purchase the firearm, but JOHNSON stated he did not want to sell it right now. JOHNSON stated he was going to Newport News soon and prices were cheaper for firearms there. JOHNSON stated everything was under $300 there. JOHNSON stated his homies had contacted him that morning to sell him firearms, and he was just waiting on the terms. JOHNSON stated the UC is about to "have everyone on his line" (supply everyone with controlled substances and firearms).

31.     After the controlled purchase, the UC then drove to a predetermined location to meet law enforcement.   The UC provided law enforcement with the suspected heroin. The UC and the UC's vehicle were searched for contraband with negative results. The suspected heroin was transported to the ATF Falls Church field office and determined to weigh approximately twenty-eight (28) grams.  The suspected heroin was sent to the DEA mid-Atlantic laboratory for

9

analysis The tests confirmed that the substance weighed 28.22 grams and contained heroin.

D. Attempted Controlled purchase from JOHNSON on June 29, 2017

32.     On June 23, 2017, JOHNSON contacted the UC and informed the UC he would be back in the morning and asked the UC what he needed. On June 24, 2017, the UC responded to JOHNSON stating he wanted an ounce of heroin. JOHNSON stated he was ready when the UC was. On June 25, 2017, JOHNSON contacted the UC and stated he was going out of town. The UC informed JOHNSON he planned to "shop" with him on June 29 and asked if the tools (firearms) had come in. JOHNSON replied, "Yea but my boy is taxing". The UC asked what kind of firearm and how much tax. JOHNSON stated "He want 6 for a 9". The UC asked JOHNSON if he could get the firearm for $500. JOHNSON stated "I wouldn't do it myself, Patience bro ima get u straight.. u kan cash that".

33.     On June 28, 2017, the UC contacted JOHNSON and confirmed they would meet around 12:30 pm on June 29. The UC informed JOHNSON he was ordering two ounces of heroin (56 grams). JOHNSON stated "U gotta meet me at the trap. I promise you…U good..on me..Ima send u the street it's right off the Pennsylvania exit…or u could ride wit me…it's up 2 u I'm just make it be known u good".

34.     On June 29, 2017, JOHNSON contacted the UC and told the UC to meet him at White Place, Southeast, Washington, DC. The UC agreed to meet JOHNSON in the area. Around 12:18 pm, the UC told JOHNSON that the UC was about to break for lunch and would be on the road to meet him. JOHNSON responded and told the UC the new address would be on N Street, Southeast, in Washington, DC. Prior to the controlled purchase, law enforcement searched the UC and his vehicle and found them to be free of illegal contraband.  Law enforcement then provided

10

the UC with $5000 of ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

35.     At approximately 1:17 pm, the UC was contacted by JOHNSON and was instructed to park at a BP gas station located at the corner of Pennsylvania Avenue and Minnesota Avenue, Southeast. At approximately 1:18 pm, law enforcement observed a blue Toyota bearing the same Virginia license plate as the blue Toyota observed on June 15 drive through the parking lot of the BP gas station. The UC received a text message from JOHNSON instructing him to move to the intersection of N Street and Minnesota Avenue, Southeast. The UC drove to that location and at approximately 1:27 pm, JOHNSON got into the front passenger seat of the UC's vehicle.

36.     JOHNSON attempted to get the UC to go on to N Street to complete the transaction, but the UC refused for safety reasons. JOHNSON stated his source was down the street in a church parking lot, but did not want to meet the UC. JOHNSON said he had to go down the street to get the heroin. The UC provided JOHNSON with the $5000 of ATF agent cashier funds. Prior to exiting the vehicle, JOHNSON told the UC that there was a rumor going around about CI-1 that CI-1 was working for the police. JOHNSON exited the vehicle and walked down N Street. The UC lost sight of JOHNSON and surveillance units did not observe JOHNSON exit the vehicle. JOHNSON never returned to the UC with the heroin. The UC attempted to contact JOHNSON several times without success and law enforcement terminated the operation.

37.     At approximately 3:12 pm, law enforcement observed JOHNSON sitting outside the PREMISES. The UC continued to contact JOHNSON with negative results.

11

E.  Purchase of Heroin from Co-Conspirator 1

38.     In April 2017, the UC was introduced to Co-Conspirator 1 through PWCPD

Confidential informant (CI-2). CI-2 will be referred to in the masculine gender, regardless of CI-

2's true gender.  CI-2 has been convicted of three felonies, including distribution of controlled

substances and a probation violation.  He was arrested in September of 2016, in Prince William

County, Virginia, for possession of controlled substances, possession of controlled substances

with intent to distribute, and possession of a firearm with an obliterated serial number.  CI-2

cooperated because he hoped to receive a lesser sentence.

39.     CI-2 identified Co-Conspirator 1 as a source of supply of heroin and firearms in

Prince William County, Virginia. Law enforcement conducted several controlled purchases of

heroin and firearms from Co-Conspirator 1 between April 2017 and July 2017. Before each

controlled purchase, law enforcement searched the UC and the UC's vehicle and found them to be

free of illegal contraband.  Law enforcement then provided the UC with ATF agent cashier funds

to conduct the controlled purchases of heroin.  The controlled purchases were also audio recorded.

All of the controlled purchases were conducted in Prince William County, Virginia. The

suspected heroin was sent to the DEA mid-Atlantic laboratory for analysis. The suspected heroin

purchased on May 17, 2017 was analyzed by the DEA mid-Atlantic laboratory and was

determined to be fentanyl. All other suspected heroin tested positive for the presence of heroin.

40.     Law enforcement purchased heroin from Co-Conspirator 1 on the following dates:

- May 4, 2017 –9.93 grams

- May 9, 2017 –28.01 grams

- May 17, 2017 –55.76 grams (fentanyl)

12

- June 1, 2017 –27.55 grams

- June 14· 2017 –27.49 grams

- July 5, 2017 –55.21 grams

41.     On July 5, 2017, law enforcement arrested Co-Conspirator 1. After being taken to

a nearby police station and after being read his *Miranda* rights and waiving those rights, law

enforcement interviewed Co-Conspirator 1. During the interview, Co-Conspirator 1 identified

JOHNSON as his source of supply of heroin. Co-Conspirator 1 pleaded guilty to using and

carrying a firearm during and in relation to a drug trafficking crime, in violation of Title 18,

United States Code, Section 924(c) and conspiracy to distribute over one hundred grams of heroin

in violation of Title 21, United Sates Code, Section 846.

42.     After Co-Conspirator 1 pleaded guilty to the federal charges described above, Co-

Conspirator 1 spoke with law enforcement on September 14, 2017. Co-Conspirator 1 was shown

a photo of JOHNSON and identified him as "Jack." Co-Conspirator 1 again identified JOHNSON

as his source of supply for heroin. Co-Conspirator 1 stated he purchased an ounce of heroin per

week from JOHNSON and has been working with JOHNSON for 2-3 months. Co-Conspirator 1

stated he would purchase an ounce of heroin from JOHNSON and then cut the heroin with

miralax to make two ounces. Co-Conspirator 1 stated the heroin purchased on the above dates

was supplied by JOHNSON.

43.     Co-Conspirator 1 stated he would meet JOHNSON in Alexandria, Virginia to

purchase heroin from JOHNSON. Co-Conspirator 1 also stated he also would meet JOHNSON in

Alexandria, Virginia and travel with JOHNSON to Washington DC in the area of Minnesota

Drive and park beside a church to purchase heroin from JOHNSON's source of supply identified

13

as "Dough" or "Doe" (hereinafter referred to as "Dough"). JOHNSON would be the middle man for the purchases from "Dough."

44.     Co-Conspirator 1 stated he would trade cocaine for heroin with JOHNSON. Co-Conspirator 1 identified JOHNSON as member of the "Milla Time" Bloods. Co-Conspirator 1 stated he had previously observed JOHNSON driving a black Jeep, a black Nissan Altima, and a red sedan. Co-Conspirator 1 stated JOHNSON was involved in a shootout and his vehicle was struck by gunfire.

F.     Review of Co-Conspirator 1's Cellular Phone

45.     On July 5, 2017, Co-Conspirator 1 provided written consent to law enforcement to view of the contents of his cellular phones. Co-Conspirator 1 identified JOHNSON as "Jack" on his contact list under cell phone number xxx-xxx-7929. This is same cell phone number JOHNSON used to contact the UC. Law enforcement observed text messages between Co-Conspirator 1 and JOHNSON from April 13, 2017 to July 5, 2017. Law enforcement observed an ongoing conspiracy to distribute heroin between JOHNSON and Co-conspirator 1. On several occasions, JOHNSON provided Co-Conspirator 1 the address on Little River Turnpike, inAlexandria, Virginia  as a meeting location. This address is across the street from where the UC met JOHNSON on June 9, 2017 to purchase 3 grams of heroin.

46.     Law enforcement observed a text message conversation on April 13, 2017 between Co-Conspirator 1 and JOHNSON. JOHNSON texted "yea wat u need". Co-Conspirator 1 responded "I need 5 Blood, and I need it asap". JOHNSON responded "of da food" and then Co-Conspirator 1 responded "Yessir, that white shit for real. That shit boomin down here". Law enforcement observed a photo sent to Co-Conspirator 1 from JOHNSON on April 15, 2017 with a

14

clear plastic bag with a white powdery substance on a digital scale.  JOHNSON texted Co-Conspirator 1 "Ready 4 u bro". Law enforcement purchased 3.5 grams of heroin from Co-Conspirator 1 on April 18, 2017.

47.     Law enforcement observed a text message conversation on April 21, 2017 between JOHNSON and Co-Conspirator 1. JOHNSON texted Co-Conspirator 1 "I got 5 g's for 250 left if u want to view how it shake". Based on my training and experience, I know "5 g's" is in reference to 5 grams, and 250 is a reference to $250. On April 25, 2017, JOHNSON texted Co-Conspirator 1 "white china on deck". Co-Conspirator responded "same price?"  JOHNSON responded "85 a joint", and then Co-Conspirator 1 responded "Ima need like 10".  Based on my training and experience, I know "white china" to be slang for heroin. On May 5, 2017, Co-Conspirator 1 texted JOHNSON "Yo bro, can I get 28 of the white" and JOHNSON responded "Ite" "He want 25". Based on my training and experience, I know "white" is slang for heroin and "25" is in reference to $2,500 for an ounce of heroin.

48.     Law enforcement observed that on June 28, 2017, JOHNSON sent a text message to Co-Conspirator 1 that stated " Bro I am letting u know this type shit is not me..i caught a tornado of setbacks..but ima b to u tomorrow..but bro jus watch I move 4 zones a week". Based on my training and experience, I know "zones" is slang for ounce quantities of controlled substances.

49.     Law enforcement observed several text messages between JOHNSON and Co-Conspirator 1 regarding meeting JOHNSON's source of supply identified as "Dough" in Washington, D.C. On May 3, 2017, JOHNSON texted "Dough said we can link at church at 230".

15

G.  Surveillance of the PREMISES

50.     On October 16 and 17, 2017 law enforcement conducted surveillance of the PREMISES. Law enforcement observed JOHNSON exit and enter the PREMISES several times through the day and night.

51.     On November 6, 2017, law enforcement conducted surveillance of the PREMISES. At approximately 1:57 pm, law enforcement observed JOHNSON exit the PREMISES and enter the black Jeep registered to JOHNSON. JOHNSON previously operated this vehicle during a controlled purchase of heroin on June 15, 2017. Law enforcement observed JOHNSON travel from the PREMISES to the area of N street and Minnesota Ave, Southeast, Washington, D.C. This area was previously identified as the location JOHNSON would be meet his source of supply of heroin, "Dough." Law enforcement lost sight of JOHNSON for approximately one minute as JOHNSON went down a service road off Minnesota Avenue near Emmanuel Church. Emmanuel Church is the suspected location of the "church" identified by Co-Conspirator 1. Law enforcement saw JOHNSON return from the service road and maintained surveillance of JOHNSON back to the PREMISES. On the way back to the PREMISES, JOHNSON stopped at a 7-11 to grab pizza, and law enforcement maintained surveillance the entire time, even while JOHNSON was inside the 7-11. Based on my training and experience and information from Co-Conspirator 1, law enforcement believes JOHNSON traveled from the PREMISES to purchase heroin from his source of supply in Washington, D.C, and then returned to the PREMISES with the heroin.

52.     Because law enforcement has conducted controlled purchases of heroin where JOHNSON was observed leaving the PREMISES before the controlled purchase and making no

16

stops prior to the controlled purchase, because JOHNSON has been surveilled returning back to the PREMISES after visiting his source of supply, and because JOHNSON has used and carried a firearm during and in relation to a drug trafficking crime, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

## **TECHNICAL TERMS**

53.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

17

c. *Storage medium*: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

54.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

55.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

18

used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

56. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

19

Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs

20

may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the

21

owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

22

57.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge

that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

58. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

59. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

24

## CONCLUSION

60.    Based on the foregoing facts, there is probable cause to believe that JAVELL

MARQUES JOHNSON is involved in the following federal offense: (i) conspiracy to distribute

and to possess with intent to distribute controlled substances, in violation of Title 21, United

States Code, Sections 841(a)(1) and 846 and (ii) carry and use of a firearm during a drug

trafficking crime, in violation of Title 18, United States Code, Section 924(c).  In addition, there

is probable cause to believe that items and records that are evidence of these violations are

currently contained in the PREMISES known as 3830 Pinewood Terrance, Falls Church, VA

22041.  I submit that this affidavit therefore supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.


_____
Jonathan F. Earle
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me this _____ day of December 2017.

_____/s/_____
Theresa Carroll Buchanan
The Honorable Theresa Carroll Buchanan
United States Magistrate Judge


25

## ATTACHMENT A

*Property to be searched*

The property to be searched is 3830 Pinewood Terrance, Falls Church, VA 22041 (the "PREMISES"). The PREMISES is described as a one story detached structure designed as a single family home. The structure is covered in yellow siding and a gray shingled roof. The address number "3830" is displayed in black numbers attached to the siding to the left of the front door. The front door is black with a white framed storm door. There is a small concrete landing with concrete stairs leading to the front door. A concrete walkway extends from there to the street in front of the structure. In addition, the search shall be extended to any locked safe or container within the PREMISES.



26

## **ATTACHMENT B**

### *Property to be seized*

a)  The items to be seized are fruits, evidence, records and information relating to,
contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1)
and 846(a) (distribution and possession with intent to marijuana and other controlled substances,
and conspiracy to distribute marijuana and other controlled substances) and Title 18, United
States Code, Section 924(c) (carry and use of a firearm during and relation to a drug trafficking
crime), including, but not limited to:

a)  Illegal narcotics and drugs, in particular heroin and cocaine, Schedule I controlled
substances.

b)  Firearms, magazines, and ammunition;

c)  Receipts documenting the purchase of firearms, magazines, and ammunition;

d)  United States currency derived from the sale of controlled substances;

e)  Money ledgers, and other documents noting the price, quantity, date and/or times
when controlled substances were purchased, possessed, transferred, distributed,
sold or concealed, or money was possessed or transferred;

f)  Bank statements and records, which might reflect the proceeds generated from the
sale of controlled substances;

g)  Indicia of control, or ownership of the premises and things described in this
warrant, such as utility bills, telephone bills, loan payment receipts, canceled
envelopes and keys, photographs, and bank records;

h)  Cellular phones, computers, and other electronic storage media or digital devices;

27

      i) For any electronics searched, any conversations, whether through text messages or other applications, where JOHNSON discusses the purchase and sale of heroin and other controlled substances;

      j) For any electronics searched, any conversations, whether through text messages or other applications, where JOHNSON discusses the purchase and use of firearms; and

      k) For any electronics searched, any photographs of controlled substances, firearms, ammunition, firearms receipts, and documentation related to the purchase of firearms.

b)     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a) evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b) evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c) evidence of the lack of such malicious software;

d) evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e) evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f) evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g) evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h) evidence of the times the COMPUTER was used;

i) passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j) documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k) records of or information about Internet Protocol addresses used by the COMPUTER;

l) records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m) contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.